Filed 5/26/21  In re L.C. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re L.C., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E076370 |
| Plaintiff and Respondent, | (Super.Ct.No. J259666) |
| v. | OPINION |
| C.C., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G. Pace, Judge.  Affirmed.

Christine E. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

C.C. (Mother) appeals the juvenile court's order terminating her parental rights as to her son L.C.-W. (L.) and freeing him for adoption. Mother argues the court erred in failing to apply the beneficial relationship exception to adoption.[1] We conclude the juvenile court did not err and affirm the order terminating Mother's parental rights.

## FACTUAL AND PROCEDURAL HISTORY

A.    <u>INITIAL DETENTION AND PETITION</u>

L. was born in September 2013 with DiGeorge syndrome (DGS), tetralogy of Fallot, and absent pulmonary artery valve with congenital heart defects. DGS is a condition associated with abnormal fetal development, an irregular 22nd chromosome, learning disabilities and delays, psychiatric issues, hearing deficits, and heart defects. His conditions required multiple medical appointments and procedures, including open heart surgery. Mother severely medically neglected L., and repeatedly failed to follow through with his medical appointments, including his open heart surgery. As a result, the San Bernardino County Children and Family Services (CFS) detained L. on April 2, 2015, and placed him in a medically fragile foster care facility.

On April 6, 2015, CFS filed a Welfare and Institutions Code[2] section 300 petition on behalf of L. pursuant to section 300, subdivision (b) (failure to protect). The juvenile court formally detained L. at the detention hearing the following day and maintained him

---

[1] B.W. (Father) is not a party to this appeal. In addition, this appeal does not involve Mother's son E.C.-P. (E.), born in March 2015.

[2] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

in his medically fragile foster home. Mother was provided with supervised visits once a week for one hour.

At the June 9, 2015 hearing, Mother admitted the allegations as amended in mediation, and consented to the terms of her case plan, which required her to attend therapy, a parenting class, and L.'s medical appointments. The court sustained L.'s petition as amended, declared him a dependent of the court, and removed him from parental custody. As to visitation, the court increased Mother's supervised visits to twice a week for one hour.

By October 2015, L. had improved considerably and did not require intensive supervision. His medically fragile care facility reported that L. was ready for discharge. The facility reported that Mother had attended all L.'s medical appointments and received instructions on caring for L. Mother had also regularly visited L. and provided him with appropriate care. Medical staff at the facility believed Mother was capable of providing needed care to the child. Mother also completed her parenting education classes, and it appeared she benefited from services. CFS thus requested L. be returned to Mother's care.

On October 29, 2015, the court approved L.'s return to Mother's care upon his discharge from the medical facility under family maintenance services.

B.     SUBSEQUENT DETENTION AND PETITION

On approximately December 28, 2015, while in Mother's care, L. sustained a head injury, later identified as subdural hematoma, and was rushed to Loma Linda University

3

Medical Center (LLUMC) for treatment. An investigation revealed L.'s injury was highly suspicious for non-accidental trauma and inconsistent with the story provided by Mother. As a result, on January 5, 2016, a petition under sections 342 (subsequent) and 387 (supplemental) was filed on behalf of L. pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (e) (severe physical abuse (child under five)), and (s) (supplemental petition for more restrictive placement).

CFS recommended the juvenile court sustain the petition, bypass reunification services to Mother, and set a section 366.26 hearing. Mother gave varying accounts of L.'s injuries and declined law enforcement's requests to submit to polygraph tests. L. had no bruising or contusion to support Mother's explanation of how L. had sustained his injury. CFS was concerned L. sustained a subdural hematoma and bilateral retinal hemorrhages. Retinal hemorrhages are typically associated with shaken baby syndrome. When Mother visited L. at the hospital, staff observed Mother to be " 'rough' " with L. Mother was also described as " 'loud' " and delayed L.'s breakfast feeding until 11:00 a.m.

Following his discharge from the hospital on January 7, 2016, L. was placed back in the medically fragile foster care facility and had to wear an orthotic helmet to avoid further head injuries. L. had exhibited some developmental delays, such as not being verbal at the age of two, using signs to get attention, and being below the standard range in his age group for growth and weight.

4

By March 2016, following further investigation and consultation with medical professionals, the forensic pediatrician continued to believe the large subdural hematoma and retinal hemorrhages were non-accidental, inflicted injuries. The doctor opined Mother's description of a short fall off the bed was inconsistent with L.'s injuries and believed L. suffered from shaken baby syndrome. Based on the forensic evidence, CFS continued to recommend Mother's services be bypassed and a section 366.26 hearing be set. CFS was also concerned about Mother's demeanor during supervised visits with L. Staff at L.'s foster care facility reported that Mother was rude and cussed at staff. Staff were also concerned about Mother and the maternal grandmother's aggressive demeanor at visits.

The contested jurisdictional/dispositional hearing was held on June 14, 16, and 21, 2016. The court admitted into evidence multiple CFS reports and attachments without objection by any party. In relevant part, Mother testified that she had "a mutual bond" with L. and was "ecstatic" when L. had been returned to her care. L.'s nurse from his medical facility testified that Mother was "verbally stern" with L. and disrespectful to staff. The nurse, however, had never seen Mother be inappropriate or abusive to L. during her visits. She also observed L.'s sad reactions when Mother would leave visits. She explained L. "would cry, go to the window, [and] hit the window [with his hands]."

On June 21, 2016, the juvenile court found some of the allegations in the petition true and declared L. a dependent of the court. The court formally removed L. from parental custody, denied the parents reunification services pursuant to section 361.5,

subdivisions (b)(5) and (6), and set a section 366.26 hearing. Mother was provided with supervised visits.

On October 19, 2016, CFS recommended to continue the matter for 90 days in order to match L. with an adoptive family. L. had another heart surgery scheduled and remained at the medical facility, but overall, his health had improved. Mother continued to visit L. weekly at the foster care facility, but struggled with boundaries. Despite being informed she could not be present at L.'s doctor appointments due to inappropriate behavior, Mother tried to convince staff to allow her to be present at L.'s medical appointments. The social worker recommended reducing the visits to once a month with authority to suspend the visits if Mother missed more than two visits or failed to comply with the visitation rules. The court ultimately conditioned Mother's visits on a confirmation call 24 hours in advance.

C.  PERMANENT PLAN

By January 17, 2017, CFS recommended maintaining L. in a permanent plan living arrangement (PPLA) until an adoptive home could be identified for him. L. continued to reside at the medical facility and continued to developmentally improve, albeit he still exhibited some delays. L. was also awaiting a cardiac procedure. CFS maintained L. could be placed in a concurrent adoptive home following his heart surgery.

By June 8, 2017, L. had been approved to transition from the medically fragile facility to a special needs foster home. L., however, was still considered medically fragile, attended services at the Inland Regional Center (IRC), and received speech

6

therapy. L. underwent an angioplasty surgery in February 2017 and was awaiting placement of a heart catheter. CFS was looking for a concurrent home for L. through the California Kids Connection program. CFS continued to recommend PPLA for L.

On July 17, 2017, Mother filed a section 388 petition seeking reunification services based on purported new evidence which identified the person who had actually caused L.'s injuries in December 2015. Following a contested section 388 hearing, the court denied the petition.

On September 13, 2017, L. was placed in a special needs foster home with Mr. and Mrs. M. L.'s developmental characteristics were consistent with autism spectrum disorder and his " 'level of functioning [was] in the mild mental retarded range.' " L.'s verbal skills were consistent with a "severe speech disorder." However, Mr. and Mrs. M. were excellent advocates of L.'s needs. L. preferred to be alone and liked to be near Mrs. M.

On July 17, 2018, CFS recommended establishing a permanent plan of legal guardianship for L. with Mr. and Mrs. M. The caregivers desired to provide permanency for L. and continued to meet his daily needs and long-term educational goals. The caregivers wanted L. "to keep up and learn as much as he can to be successful." CFS noted that L. had exhibited "great progress . . . in the six months he [had] been at [his preschool]."

Mother continued to visit L. on a weekly basis with occasional absences. On March 27, 2018, the maternal grandmother had attended the visit with Mother and

7

complained that L. called Mrs. M. " 'mom.' " The social worker believed this showed L.'s attachment to his caregiver. Overall, Mother's visits with L. went well and were described as appropriate. During the visits, Mother played with toy cars, colored books, or made paper planes with L. The visitation monitor reported that "[t]he [m]inor transitioned well from bio to foster parent."

By November 14, 2018, CFS recommended to maintain L. with Mr. and Mrs. M. under legal guardianship. Although L. was developmentally delayed, he was friendly and polite. In addition, his language skills were improving, and he spoke in two- to three-word sentences. The caregivers continued to advocate for L.'s special needs, including meeting with L.'s school when he was not placed in a correct classroom. L. was also improving medically. He had attended a revision of his stents and continued to be monitored by a cardiologist. In addition, L. participated in all of his caregivers' family's activities. He enjoyed playing outside and in the park. Mrs. M., however, emphasized that L. required constant supervision and he did not understand the concept of danger while he was out in the community. As a result, Mrs. M. constantly made sure L. remained close and safe at all times.

Mother's participation in her visits with L. remained relatively consistent. She cancelled visits on average once a month. Mother's visits were appropriate; she played with L. during her visits and there were no reported concerns. But Mother was upset L. called Mrs. M. " 'ma-ma.' "

8

On November 14, 2018, the juvenile court ordered legal guardianship for L. with Mr. and Mrs. M. Mother was provided with weekly supervised visits.

Ten months later, on September 11, 2019, Mrs. M. filed a section 388 petition for modification seeking to adopt L. CFS recommended to grant the petition due to a strong mutual attachment between L. and Mr. and Mrs. M. L. was placed in Mr. and Mrs. M.'s home on September 13, 2017, when he was four years old. Over the years, Mr. and Mrs. M. had developed a strong attachment to L., who was six years old at the time, and were willing to provide him with a stable and secure home. Mr. and Mrs. M. had met all of L.'s needs over the years and desired to provide "a more stable and permanent home . . . a child deserve[s]." L. also had developed a strong bond to Mr. and Mrs. M. and had integrated into the family and been received as a family member.

On November 7, 2019, the juvenile court granted the section 388 petition and set a section 366.26 selection and implementation hearing.

L. continued to receive medical treatment and underwent a heart surgery in November 2019 and March 2020. Mother continued to receive weekly supervised visits at a neutral location. During the months of quarantine, Mother received weekly supervised phone calls with L. which lasted between 40 minutes to one hour. Mother usually could determine when L. lost focus and would end the call.

By January 4, 2021, CFS recommended to terminate parental rights and free L. for adoption by Mr. and Mrs. M. CFS opined L. was adoptable. L. had developmental delays for which he received therapy five times a week for four hours a day. Mr. and

9

Mrs. M. believed L. was very bright, communicative with a good sense of humor, and had an excellent memory. When first presented to a stranger, L. appeared shy, but became friendly and engaging with time. L. exhibited a healthy bond to his caregivers. He called for his caregivers when he needed or wanted them and showed appropriate affection. Mrs. M. admitted that she was initially hesitant to adopt L. due to being scared about his heart condition, but over the years, she understood L. and all his needs.

Mother continued to participate in supervised weekly phone calls with L. Her communication with L. was appropriate, and she inquired of L.'s daily activities and plans for the holidays. When L. would lose focus, the phone call would end. Mother generally ended the phone calls by saying she loved L. In response, L. customarily replied, " 'I love you more[,] bye.' "

The contested section 366.26 hearing was held on January 4, 2021. Mother testified that L. was removed at the age of two and a half years and that since then she had consistently visited L. once a week with the exception being when L. was under legal guardianship. During the visits, Mother played with L., read, learned, roamed around the house, and participated in outdoor activities. Mother claimed that she attended "[e]very doctor['s] appointment . . . not in conflict with [her] job," and that L. was excited to see her and wanted to talk and know everything. She also stated that L. called her either "Mom" or "Mama" and that he told her he loved her. Mother acknowledged that she had never participated in any educational decisions for L. She believed L. enjoyed the visits

10

with her but admitted L. did not seek comfort from her on an occasion when he was upset.

The court found Mother met the first prong of the parental bond exception of maintaining regular visits and contacts with L. However, the court noted that L. had been removed from Mother's care for four and a half years and "the day-to-day parenting of [L.] [had] been taking place by the other people for the vast majority of his life, and certainly for the last three years." Balancing between the bond and the child's need for permanency, the court found that the benefit "[the] adoption will provide for [L.] outweighs the severing of the parental bond." Accordingly, the court terminated parental rights and freed the child for adoption. Mother timely appealed.

## DISCUSSION

Mother's sole argument on appeal is that the juvenile court erroneously found that the beneficial parental relationship exception did not apply. We disagree.

The Legislature prefers adoption where possible. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) Once the juvenile court finds a child is adoptable, the parent bears the burden of proving one of the exceptions to terminating parental rights exists. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

The parental benefit or beneficial relationship exception has two prongs. First, the parent must show that he or she has "maintained regular visitation and contact with the

11

minor.' " (*In re Derek W.* (1999) 73 Cal.App.4th 823, 826.)  Second, the parent must show that his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

"When applying the beneficial parent-child relationship exception, the court balances the strength and quality of the parent-child relationship in a tenuous placement against the security and sense of belonging that a stable family would confer on the child. If severing the existing parental relationship would deprive the child of 'a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1234-1235.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child."  (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395 (*Anthony B.*); accord, *In re E.T.* (2018) 31 Cal.App.5th 68, 76 (*E.T.*).)

The juvenile court found that Mother maintained regular visitation and contact with L.  Mother thus satisfied the first prong of the beneficial relationship exception. But, Mother provides no specific argument on the second prong.  She does not explain why terminating her parental rights to L. would "greatly harm" the child.  Mother

12

likewise provides no argument as to why her relationship with L. is "so significant and compelling . . . that the benefit of preserving it outweighed the stability and benefits of adoption." (*Anthony B.*, *supra*, 239 Cal.App.4th at p. 396.)

"The juvenile court's orders are 'presumed to be correct, and it is [an] appellant's burden to affirmatively show error.' " (*In re J.F.* (2019) 39 Cal.App.5th 70, 79.) Because Mother does not explain why she satisfied the second prong of the beneficial relationship exception, besides stating the mutual love between them and noting the positive visits she had with L., she has failed to show the juvenile court erroneously found that the exception did not apply. And because her only argument on appeal is that the juvenile court erroneously failed to apply the beneficial relationship exception, she has "not met [her] burden of demonstrating reversible error through reasoned argument." (*Id.* at pp. 79-80.) We therefore "deem [her] challenge to the order terminating [her] parental rights to be waived." (*Ibid.*; see *In re S.R.* (2020) 48 Cal.App.5th 204, 206, fn. 1 [declining to address argument that appellant failed to properly brief].)

In any event, Mother's challenge to the order terminating her parental rights fails on the merits. The juvenile court did not abuse its discretion in finding that there was no "compelling reason for finding that termination [of parental rights] would be detrimental to the child. [Citations.]" (*Anthony B.*, *supra*, 239 Cal.App.4th at p. 395.)

Mother contends she had a parental relationship with L. However, even if she did, nothing in the record suggests that "terminating [her] familial relationship would cause [the child] great harm." (*E.T.*, *supra*, 31 Cal.App.5th at p. 77.) There is no evidence that

Mother occupied a "meaningful and significant parental role."  (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109.)

L. was initially removed from Mother's custody in April 2015 when he was only 18 months old and placed in a medically fragile foster care facility.  After Mother successfully completed reunification services, L. was returned to Mother's care under family maintenance services in October 2015.  However, two months later, L. was again removed from Mother's custody after he suffered a non-accidental head injury in December 2015.  For over five years, L. resided with someone other than Mother.  And, for the last three and a half years, L. resided with his prospective adoptive parents, Mr. and Mrs. M.  L. is safe and well-cared for in his prospective adoptive home.  L. is bonded with Mr. and Mrs. M., who are committed to adopting him and providing him with a permanent, safe, and stable home.  For over three years, Mr. and Mrs. M. provided all L.'s needs, including his medical, developmental, emotional, and educational needs.

The juvenile court reasonably found that Mother's frequent contact with L. was not sufficient to establish a beneficial parental relationship exception.  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 644-645; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.)  Although Mother regularly visited L. and maintained a relationship with him, Mother's relationship with L. during the dependency proceedings was that of a friendly visitor, rather than that of a parent.  They had fun, enjoyable visits together, and L. called Mother "mom" and told her he loved her.  However, Mother did not hold a parental role,

disciplining L., protecting L., and providing for his everyday needs. Mother had not lived with L. for over five years, and her visits had remained short and supervised.

The juvenile court thus reasonably found that the benefit L. would derive from a parental relationship with Mother does not "outweigh the well-being [he] would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Mother failed to show anything more than that she had frequent contact with the child that raised no concerns. But, a loving and friendly relationship is " 'not enough to outweigh the sense of security and belonging an adoptive home would provide.' " (*In re Jason J.* (2009) 175 Cal.App.4th 922, 938.) The juvenile court thus did not abuse its discretion in finding that the benefits of adoption outweighed the benefits of continuing Mother's relationship with the child. We therefore conclude the juvenile court properly terminated Mother's parental rights to L. and freed him for adoption.

## DISPOSITION

The order terminating parental rights to L. is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER _____

J.

We concur:

RAMIREZ _____

P. J.

McKINSTER _____

J.

15